**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ESTATE OF NAYSHAUN UCH WILLIAMS, by and through its Administrator, AISHA CLAYTON**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CITY OF PHILADELPHIA, FELICIA R. HARRISON, ASHLEY JOHN DWAYNE C. JONES, ALONZO LYAS, GREATER PHILADELPHIA COMMUNITY ALLIANCE, AVA HARRIS, MONICA COOK, and JANE/JOHN DOES 1-20**<br><br>**Defendants.** | **Civil No. 25-6121**<br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff Estate of Nayshaun Uch Williams, by and through its Administrator, by the undersigned attorneys, brings this civil action against the above-named Defendants and complains as follows:

## JURISDICTION AND VENUE

1. Federal jurisdiction in this matter is asserted pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

2. Venue is properly laid within the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) and (c), as the events giving rise to this action occurred in Philadelphia County, Pennsylvania.

## NATURE OF THE CASE

3. This is a civil rights action arising from the tragic and preventable death of 11-year-old Nayshaun Uch Williams, who died on October 28, 2023, from a severe asthma attack after Defendants repeatedly ignored clear warning signs of medical neglect and child endangerment.

4. Despite multiple reports to Defendant City of Philadelphia's Department of Human Services about Nayshaun being sent to school without his rescue inhaler, missing excessive days of school, and living in dangerous conditions with a registered sex offender, Defendants systematically failed to protect this vulnerable child, closing their investigation as "unfounded" just one week before his death.

5. Nayshaun's death was not merely foreseeable—it was predictable and preventable, resulting directly from Defendants' indifference to his safety and constitutional rights.

## PARTIES

6. Plaintiff Estate of Nayshaun Uch Williams is administered by Aisha Clayton, who brings this action on behalf of Nayshaun Williams, who at all relevant times was a child residing at 2135 East Sanger Street, Philadelphia, PA 19134.

7. Defendant City of Philadelphia is a city, political subdivision, and governmental entity of the Commonwealth of Pennsylvania, with a principal place of business at City Hall, 1400 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.

8. The Philadelphia Department of Human Services ("DHS") is a municipal or government agency or entity of the City of Philadelphia. DHS does not have an independent corporate existence from the City of Philadelphia, and therefore, all claims against DHS must be,

and are, brought in the name of the City of Philadelphia. DHS is responsible for the safety and well-being of children at risk of abuse, neglect, and dependency. DHS contracts with private agencies to provide protective services on behalf of the Commonwealth of Pennsylvania and the City of Philadelphia, making these contractors state actors for purposes of 42 U.S.C. § 1983 only.

9. Defendant Felicia R. Harrison was at all relevant times a DHS employee who participated in investigations involving Nayshaun. She is sued in her individual capacity.

10. Defendant Ashley John was at all relevant times a DHS employee who participated in investigations involving Nayshaun. She is sued in her individual capacity.

11. Defendant Dwayne C. Jones was at all relevant times a DHS employee who participated in multiple investigations involving Nayshaun. He is sued in his individual capacity.

12. Defendant Alonzo Lyas was at all relevant times a DHS employee who participated in investigations involving Nayshaun. He is sued in his individual capacity.

13. Defendants John/Jane Does 1-10 are DHS employees whose identities are currently unknown, but who participated in the pattern of deliberate indifference to Nayshaun's safety.

14. Defendant Greater Philadelphia Community Alliance ("GPCA"), formerly known as United Communities of Southeast Philadelphia ("United Communities"), is a Pennsylvania nonprofit corporation that contracted with DHS to provide in-home child welfare services. GPCA has a place of business at 1529 S 22nd St, Philadelphia, PA 19146. By accepting DHS contracts and assuming state responsibilities for child protection, United Communities acted under color of state law and is subject to liability under 42 U.S.C. § 1983.

15. Defendant Ava Harris was at all relevant times a United Communities case

manager who participated in investigations involving Nayshaun. She is sued in her individual capacity.

16. Defendant Monica Cook was at all relevant times a United Communities supervising case manager who participated in investigations involving Nayshaun. She is sued in her individual capacity.

17. Defendants John/Jane Does 11-20 are United Communities and/or GPCA employees whose identities are currently unknown, but who participated in providing inadequate services to Nayshaun. They are sued in their individual capacities.

## FACTUAL BACKGROUND

### Nayshaun Williams' Tragic and Preventable Death

18. On October 28, 2023, the following tragic sequence of events unfolded—events that were the predictable result of years of systemic failure detailed in this Complaint.

19. On the morning of October 28, 2023, at approximately 8:00 AM, 11-year-old Nayshaun Williams woke his grandmother Patricia Clayton stating he could not breathe.

20. Patricia Clayton attempted to use a nebulizer machine to treat Nayshaun's asthma attack. The nebulizer was positioned on the dining room table next to a hookah.

21. The nebulizer treatment was ineffective because Nayshaun needed his fast-acting rescue inhaler.

22. He did not have his rescue inhaler because Defendant City of Philadelphia, through DHS, had failed to ensure that he attended doctor appointments that it arranged days earlier.

23. The purpose of the appointments was for Nayshaun to receive rescue inhalers.

24. DHS then failed to reschedule the missed appointments even after Patricia

Clayton requested that DHS do so.

25. DHS failed to ensure that Nayshaun receive his rescue inhaler even after being told by Nayshaun's school nurse weeks earlier that not having the inhalers placed Nayshaun in a life-threating situation.

26. Emergency services were called, but by the time paramedics arrived and transported Nayshaun to the hospital, it was too late.

27. Nayshaun Williams was pronounced dead on October 28, 2023, from a severe asthma attack.

28. This death was entirely preventable.

29. Defendants knew that the point of the doctor appointments scheduled days before Nayshaun's death was to secure rescue inhalers for Nayshaun.

**DHS' Historical Pattern and Practice of Neglect and Recklessness**

30. DHS has demonstrated a persistent pattern of failing to protect vulnerable children, dating back to before the 2012 establishment of the Community Umbrella Agency (CUA) system in which it employed Defendant GPCA.

31. The tragic 2006 death of 14-year-old Danieal Kelly exemplifies this systemic negligence and recklessness—Kelly died from starvation while actively receiving DHS services, covered in bruises and bedsores, weighing only 42 pounds.

32. Despite a grand jury finding that DHS social workers had simply failed to follow prescribed procedures and that Kelly would be alive had they done so, DHS proceeded with the CUA restructuring rather than addressing fundamental worker accountability issues, thus showing a deliberate indifference to the harms such issues presented to DHS clients.

33. This pattern continued under the CUA system through the actions of the

companies (referred to as CUAs) contracted through DHS to provide services to Philadelphia children and families.

34. This pattern is evidenced by the 2022 death of 3-year-old Hope Jones, who died from multiple blunt-force trauma injuries while in the care of CUA Northeast Treatment Centers, a case that settled for $6.5 million.

35. Similarly, in 2020, a 3-year-old boy identified as T.E. was found with fresh bruises, malnourishment, bradycardia from extreme dieting, and marks suggesting he had been tied—all while under the supervision of CUA Turning Points for Children ("TPFC").

36. In both cases, a lack of responsible oversight by DHS was present as well as irresponsible supervision by the CUA caseworkers involved.

37. Upon information and belief, CUA caseworkers, including the individually named Defendants in this lawsuit, are trained by DHS.

38. Between 2012 and 2024, nearly 70 lawsuits were filed against the CUAs, including Defendant GPCA/United Communities, for allegedly allowing children in their care to be hurt, killed, assaulted, burned, beaten, and sexually abused, with at least 50 of these lawsuits resulting in settlements or verdicts of $1 million or more.

39. A recent study revealed that between 2017 and 2022 alone, Philadelphia investigated almost 900 reports of abuse or neglect to children in government care and confirmed 186 cases, though these numbers likely represent significant undercounts.

40. DHS's inadequate oversight of the CUAs is further demonstrated by systemic failures in placement decisions—at least five lawsuits involved children with serious medical needs who were placed in regular foster homes lacking required medically trained caregivers, including four death cases.

41. This occurred because CUA staff failed to inform DHS's referral unit about children's medical conditions; because DHS failed to adequately supervise the CUA staff; and/or because DHS workers failed to adequately review children's files before making placements.

42. DHS and the CUAs it employs fail to maintain manageable caseloads—with workers regularly handling 11 to 20+ *families* despite a stated goal of 10 and industry standards recommending 12-15 *individual children, not families,* per worker.

43. In 2021, it was discovered that one CUA offered $500 bonuses to staff to take on more than 13 cases each.

44. The failure of DHS and CUAs such as Defendant GPCA/United Communities to maintain manageable caseloads has created conditions where proper supervision and investigation of abuse reports become virtually impossible, perpetuating a cycle of neglect that has resulted in preventable harm and death to children ostensibly under the agency's protection.

**Nayshaun's Medical Condition and Living Situation**

45. Nayshaun Williams was an 11-year-old child with severe asthma, a life-threatening condition requiring daily management and immediate access to rescue medication.

46. Nayshaun lived at 2135 East Sanger Street, Philadelphia, with his grandmother, Patricia Clayton, who was his legal guardian.

47. Despite his serious medical condition, Nayshaun was repeatedly sent to school without his rescue inhaler, an essential life-saving medication.

48. The home environment included Patricia Clayton's boyfriend, who was a registered sex offender and had regular, unsupervised contact with Nayshaun.

**The 2019 DHS and CUA Investigations**

49. In February 2019, DHS received reports regarding sexual abuse concerns

involving Nayshaun and initiated an investigation.

50. It was reported to DHS that a registered sex offender lived at Nayshaun's home, walked Nayshaun to school daily and had made grooming statements to Nayshaun and other children.

51. DHS dismissed concerns about this person, falsely claiming the person did not live in the home, despite family reports that the person was present daily and had unsupervised access to Nayshaun.

52. However, DHS substantiated an allegation that six-year-old Nayshaun was sexually acting out with a younger cousin, demonstrating concerning sexualized behaviors.

53. Despite serious allegations and the presence of a registered sex offender in the home with regular access to a traumatized child exhibiting sexual reactive behaviors, Defendant Alonzo Lyas and other DHS workers closed the investigation without taking protective action.

54. Following the February 2019 DHS investigation, the agency referred Nayshaun to CUA TPFC for contracted services.

55. Upon information and belief, DHS contracted with TPFC to provide in-home safety services which included case management, coordination of therapeutic services, monitoring of family compliance, and ensuring Nayshaun received the CUA services (therapy) that DHS had determined were necessary.

56. On or about February 26, 2019, TPFC began providing in-home safety services to Nayshaun and his family.

57. TPFC assigned employees to oversee Nayshaun's case and ensure all therapeutic goals were achieved before case closure.

58. DHS and TPFC case notes document that Patricia Clayton, Nayshaun's

grandmother, told DHS that she would not transport Nayshaun to therapy.

59. TPFC case notes further document that the "family chose to not sign CBH collaterals" necessary to coordinate behavioral health services for Nayshaun's documented sexual reactive behaviors and grief.

60. Upon information and belief, CBH stands for Community Behavioral Health.

61. This refusal occurred within the first weeks of service provided by TPFC, yet neither DHS nor TPFC took any meaningful action to address this critical barrier to treatment.

62. Upon information and belief, TPFC terminated services on July 10, 2019, after only 4.5 months.

63. DHS's case file for Nayshaun contains no TPFC home visit notes that document conditions in the home, no therapy progress notes, no documentation of attempts to address grandmother's non-compliance, and no explanation for why services were terminated without the goals achieved.

64. By allowing the closure of Nayshaun's case with zero goals achieved and imposing no consequences for Patricia Clayton's refusal to provide necessary care, DHS sent a clear and deadly message: medical and therapeutic neglect of this vulnerable child would be tolerated without accountability.

**The Pattern Continues: 2019-2023**

65. Following DHS and TPFC's premature case closure in July 2019, Nayshaun remained in Patricia Clayton's care with no oversight, no therapy, and no consequences for the grandmother's inability to provide adequate care.

66. Over the next four years, multiple warning signs emerged that should have triggered renewed DHS intervention:

a. Chronic truancy and educational neglect;

b. Continued presence of the registered sex offender in the home;

c. Missed medical appointments;

d. Reports from school officials about Nayshaun's untreated medical needs;

e. Ongoing reports to DHS about conditions in the home; and

f. Patricia Clayton's pattern of unmedicated mental health conditions and substance use.

67. On several occasions, concerns were reported to DHS during this period, and investigations were opened and closed without meaningful intervention, thus reinforcing the pattern established in 2019.

68. On some occasions, concerns were reported to DHS and no investigations were opened, thus preventing meaningful intervention while also reinforcing the pattern established in 2019.

69. Nadira Duckett made repeated attempts to report concerns to DHS but was told the cases were closed or unfounded.

70. Defendant Dwayne C. Jones was a DHS case worker assigned to Nayshaun's family.

71. Defendant Dwayne C. Jones specifically told family members that cases were closed, without explaining what investigation had been conducted or what findings had been made.

72. On May 15, 2023, DHS received a referral alleging Patricia Clayton failed to provide adequate nurturing/affection, basic needs, and that Nayshaun was ungovernable.

73. Specifically, Nayshaun brought vapes to school and had been in multiple fights in

school and in the community. He cut another child with a knife, and "vandalizes and terrorizes the neighborhood."

74. It was noted that Patricia Clayton would be relieved with outside help from an agency like Child Protective Services ("CPS") because she could not handle Nayshaun.

75. Investigator Felicia R. Harrison and Supervisor Ashley John closed this investigation as "Invalid" on July 7, 2023, finding "insufficient evidence" despite documented concerns about the Nayshaun's welfare.

76. Thus, DHS failed to provide any aid to Nayshaun.

**The Fatal Crisis: September – October 2023**

77. Due to severe asthma, Nayshaun frequently experienced respiratory distress at school.

78. The school nurse at Sullivan Elementary School, where Nayshaun was a student, made at least 13 attempts throughout the 2023-2024 school year to contact Patricia Clayton about Nayshaun's severe asthma, his repeated absences from school, and his lack of a rescue inhaler.

79. By October of the 2023-2024 school year, Nayshaun had already missed 20 days of school.

80. On September 6, 2023, when Nayshaun had difficulty breathing at school and experienced an asthma attack, the school nurse attempted to contact Patricia Clayton but could not reach her despite multiple calls.

81. With Nayshaun in respiratory distress and unable to reach his guardian, the school nurse was forced to call 911 and have Nayshaun transported by ambulance to the hospital.

82. Following this emergency, the school nurse specifically reported to DHS that:

a) Nayshaun was being repeatedly sent to school without his rescue inhaler;

b) this was a life-threatening situation for a child with severe asthma;

c) Patricia Clayton was not responding to school communications;

d) Nayshaun had already missed 20 days of school; and

e) the nurse believed Nayshaun was being medically neglected and needed immediate intervention.

83. The school nurse explicitly told DHS she believed Nayshaun was being neglected and that his life was at risk without his rescue inhaler.

84. DHS Investigator Dwayne C. Jones handled this investigation.

85. Despite knowing of the school nurse's ongoing attempts to address Nayshaun's missing inhaler since at least 2021, and despite reviewing reports documenting "student has a history of asthma with no inhaler in school or on his person," on October 5, 2023, Defendant Jones assessed the charge of abuse as "unfounded".

86. DHS workers who handled the October 2023 investigation were dismissive and rude to the school nurse, minimizing her professional concerns instead of recognizing it as a life-threatening emergency.

87. During this time, Defendant GPCA/United Communities also provided services to Nayshaun.

88. Just as with DHS and TPFC, GPCA/United Communities failed to protect Nayshaun.

89. Defendant Ava Harris was the case manager assigned to the family and Defendant Monica Cook was the assigned case management supervisor.

90. Defendant GPCA/United Communities had a duty to monitor Nayshaun's welfare, knew or should have known about his medical neglect, and failed to take action to protect him.

91. Specifically, Defendant GPCA/United Communities failed to make sure proper support was in place to address Nayshaun's needs.

92. DHS's case file for Nayshaun contains no GPCA/United Community home visit notes documenting conditions in the home, no therapy progress notes, no documentation of attempts to address Nayshaun's needs, and no explanation of what the goals of service were.

**DHS Fails to Secure Nayshaun's Rescue Inhalers**

93. Following the September 6, 2023 asthma attack, a DHS nurse concluded that Nayshaun needed "new med management" and informed Patricia Clayton that it would take on the duty of arranging medical care for Nayshaun.

94. This care included arranging for Nayshaun to be seen by a pulmonary doctor.

95. The DHS nurse gave Nayshaun a lesson on asthma and the anatomy of the lungs.

96. Subsequently, DHS nurse Mary Anne Clayton made appointments for Nayshaun to be seen at Children's Hospital of Philadelphia and Juniata Family Practice on October 13, 2023, and October 16, 2023 respectively.

97. DHS arranged transportation for the October 13th appointment and even contacted Patricia Clayton when the transportation arrived to take Nayshaun to his appointment. However, Patricia Clayton refused to put Nayshaun in the vehicle and Nayshaun missed this appointment.

98. DHS knew the importance of this medical appointment as it took it upon itself to set up the appointment.

99. Despite knowing the importance of the appointment, which included the ability to provide Nayshaun with his much-needed emergency inhaler, DHS took no action against Patricia Clayton, nor did it take any steps to remove Nayshaun from the home or to provide him with the medical care he needed.

100. Patricia Clayton contacted DHS and asked that this appointment be rescheduled. DHS did not reschedule this appointment.

101. The October 16th appointment at Juniata Family Practice was also missed without explanation.

102. Again, despite knowing the importance of the appointment, which included the ability to provide Nayshaun with his much-needed emergency inhaler, DHS took no action against Patricia Clayton, nor did it take any steps to remove Nayshaun from the home or to provide him with the medical care he needed.

103. This appointment, like the October 13th appointment, was also not rescheduled by DHS despite DHS having assumed responsibility for Nayshaun's medical care and knowing that Nayshaun did not attend.

104. Despite these obvious dangers to Nayshaun's health, DHS closed its investigation of medical neglect, as "Unfounded" on October 19, 2023.

105. Days later, Nayshaun died of an asthma attack.

**COUNT I: VIOLATION OF 42 U.S.C. § 1983**
**(Against Individual DHS Defendants: Harrison, John, Jones, Lyas and John/Jane Does 1-10; Individual GPCA Defendants: Harris, Cook and John/Jane Does 11-20; City of Philadelphia, and GPCA)**

106. Plaintiff realleges and incorporates by reference all other allegations of this Complaint as if fully set forth herein.

107. This is a civil rights claim brought pursuant to 42 U.S.C. §1983 that challenges the constitutionality of Defendants' actions, which caused Nayshaun's devastating death.

108. To plead a cause of action under the plain language of §1983, a plaintiff must allege (1) that some person deprived him of a federal right; and (2) that the person who deprived him of that right acted under the color of state law.

109. At all relevant times, Nayshaun had substantive and procedural due process rights to be free from state-created dangers or risks that could cause significant bodily harm, as bodily integrity and human dignity are protected by the Fourteenth Amendment of the United States Constitution. The Fourteenth Amendment holds that no state shall deprive any person of life, liberty or property without due process of law.

110. Individual Defendants, GPCA, and the City affirmatively caused Nayshaun to be subjected to the deprivation of rights, privileges, and immunities secured to him by the Constitution and by 42 U.S.C. § 1983, namely his substantive and procedural due process rights to be free from bodily harm and death.

111. At all times relevant to this claim, Individual Defendants, GPCA, and the City of Philadelphia, and its agents and servants were acting under the color of state law. Each Defendant was tasked with performing duties and services that fall within the exclusive prerogative of the state, namely making decisions regarding the removal of children from their homes.

112. The injuries sustained by Nayshaun were foreseeable to Individual Defendants, GPCA, and the City, who had actual knowledge that:

a) Nayshaun had recently suffered an asthma attack at school that resulted in him being transferred to a hospital by ambulance;

b) Nayshaun was repeatedly sent to school without his rescue inhaler, thus creating a life-threatening situation for a child with severe asthma;

c) Patricia Clayton was refusing to respond to school communications regarding Nayshaun's inhaler;

d) Patricia Clayton was an unfit caregiver;

e) there existed a clear risk Patricia Clayton would not provide Nayshaun with necessary care;

f) Nayshaun needed new medical management;

g) Nayshaun needed medical appointments, including one with a pulmonary doctor;

h) Nayshaun needed rescue inhalers; and

i) without the rescue inhalers, there existed a clear risk of medical neglect leading to death.

113. The actions and conduct of Individual Defendants, GPCA, and the City were a substantial and direct factor in causing the death of Nayshaun.

114. For example, by deciding to leave Nayshaun in the home of Patricia Clayton, Defendants subjected him to the medical neglect that led to his death.

115. Defendants' failure to ensure that Nayshaun received his much-needed rescue inhaler was a substantial and direct factor in causing Nayshaun's death.

116. The actions and conduct of Individual Defendants, GPCA, and the City with respect to the investigations of Nayshaun's care and oversight of his safety were reckless, willful, and wanton, in reckless disregard of the safety and well-being of Nayshaun, and of a degree of culpability that shocks the conscience.

117. Defendants' actions amounted to more than mere negligence as they were repeatedly presented with the neglectful and hazardous conditions in which Nayshaun lived, and they were aware of his need for a rescue inhaler and yet took no actions to correct these conditions and factors.

118. Based on, among other things, their responsibility for Nayshaun and their statutory obligation to ensure that he was safe and properly cared for, Individual Defendants had

a duty to protect Nayshaun from medical neglect.

119. Defendants were tasked with the ability to perform actions within the sole purview of the state: removing children from their homes. Defendants dismissed this responsibility in Nayshaun's case and were repeatedly deliberately indifferent to the need to remove Nayshaun from Patricia Clayton and provide him with proper care.

120. The actions and conduct of Individual Defendants, GPCA, and the City with respect to the investigations of complaints relating to Nayshaun and the oversight of Nayshaun were part of a pattern and practice of closing cases without adequate investigation and a failure to exercise appropriate supervision and intervention.

121. By opening investigations, closing them as "unfounded" despite clear evidence of medical neglect, dismissing mandatory reporters, and failing to ensure Nayshaun had access to life-saving medication, Individual Defendants, GPCA, and the City, as state actors, affirmatively used their authority in a way that created and perpetuated a known and obvious danger to Nayshaun, and that rendered him vulnerable to the known unsafe and dangerous conditions present in Patricia Clayton's care.

122. The City created a danger to Nayshaun by failing to conduct adequate home visits or document family engagement during the 2019 service period.

123. The City created a danger to Nayshaun by allowing his case to be closed despite documented evidence that Patricia Clayton told DHS that she would not transport Nayshaun to therapy and her refusal to coordinate behavioral health services for Nayshaun despite Nayshaun's documented sexual reactive behaviors and grief.

124. The City created a danger to Nayshaun be refusing to ensure that he attended a doctor's appointment that the City set up after taking over his medical management when it

knew that he needed rescue inhalers.

125. The City, through DHS, created a danger to Nayshaun by first taking on the affirmative duty to schedule Nayshaun's doctor appointments after his emergency asthma attack and then refusing to reschedule the missed doctor's appointment when Patricia Clayton contacted DHS to request that the appointment be rescheduled.

126. Had DHS never taken over Nayshaun's medical management and scheduled his doctor's appointments, Patricia Clayton could have rescheduled the missed appointments herself and secured rescue inhalers for Nayshaun.

127. The City created a danger to Nayshaun by establishing a pattern where Patricia Clayton learned she could refuse to provide necessary care without consequences, a pattern that continued until it killed him in 2023.

128. GPCA Defendants Ava Harris and Monica Cook created a danger to Nayshaun in 2023 by failing to adequately monitor his medical needs despite being assigned as his case manager and supervisor.

129. GPCA Defendants created a danger to Nayshaun by failing to respond to or escalate concerns about his chronic school absences, lack of rescue inhaler, and medical neglect during the 2023 service period.

130. GPCA Defendants created a danger to Nayshaun by failing to ensure Patricia Clayton was complying with medical care requirements, despite knowing of his severe asthma and the history of non-compliance documented by TPFC in 2019.

131. GPCA Defendants created a danger to Nayshaun by failing to coordinate with DHS investigators during the October 2023 medical neglect investigation and failing to provide critical information about ongoing service provision and observed neglect.

132. GPCA Defendants created a danger to Nayshaun by continuing to provide inadequate services without meaningful intervention right up until his death, reinforcing Patricia Clayton's belief that medical neglect would be tolerated.

133. Individual Defendants created a danger to Nayshaun by failing to follow DHS regulations, failing to complete timely, accurate, and complete reports about Nayshaun, and failing to report the medical neglect to others who could have intervened on his behalf, such as medical providers.

134. DHS Individual Defendants created a danger to Nayshaun by dismissing and being rude to the school nurse who reported the medical neglect, discouraging advocacy on his behalf.

135. DHS Individual Defendants created a danger to Nayshaun by closing multiple investigations from 2019 through 2023 without meaningful intervention.

136. GPCA Defendants Ava Harris and Monica Cook specifically created a danger to Nayshaun by providing inadequate services in 2023, failing to monitor his medical needs, and failing to report Patricia Clayton's ongoing medical neglect to DHS despite being actively involved with the family at the time of his death.

137. Defendants' actions rendered Nayshaun more vulnerable to danger than had they never affirmatively intervened.

138. For example, had DHS never taken over Nayshaun's medical management and scheduled his appointments, Patricia Clayton would not have relied on DHS to reschedule the appointments she missed to get Nayshaun rescue inhalers.

139. Additionally, Defendants' actions, including their failure to remove Nayshaun from his home, taught Patricia Clayton that medical and therapeutic neglect would be tolerated.

140. However, through their affirmative actions, Defendants also subjected Nayshaun to harm.

141. As a direct and proximate result of Defendants' violations of Nayshaun's constitutional rights, Plaintiff suffered devastating injuries, including death.

**COUNT II: VIOLATION OF 42 U.S.C. § 1983**
**(Against GPCA and City of Philadelphia)**

142. Plaintiff realleges and incorporates by reference all other allegations of this Complaint as if fully set forth herein.

143. Plaintiff brings this civil action against GPCA and the City of Philadelphia pursuant to the rights set forth in 42 U.S.C. § 1983, and the doctrinal tenets of the case law interpreting this statute and seeks all damages cognizable by law against these defendants.

144. To plead a cause of action under the plain language of §1983, a plaintiff must allege (1) that some person deprived him of a federal right; and (2) that the person who deprived him of that right acted under the color of state law.

145. At all relevant times, Nayshaun had substantive and procedural due process rights to be free from state-created dangers or risks that could cause significant bodily harm, as bodily integrity and human dignity are protected by the Fourteenth Amendment of the United States Constitution. The Fourteenth Amendment holds that no state shall deprive any person of life, liberty or property without due process of law.

146. As shown above in Count I, Nayshaun was subjected to the deprivation of rights, privileges, and immunities secured to him by the Fourteenth Amendment, namely his substantive and procedural due process rights to be free from bodily harm and death.

147. Defendants GPCA and the City of Philadelphia caused this deprivation by adopting and maintaining a practice, custom or policy of reckless indifference to known

conditions of neglect and mistreatment of investigations and cases within DHS and GPCA.

148. Defendants GPCA and the City deprived Nayshaun of the rights, privileges and immunities secured to him by the Fourteenth Amendment by, *inter alia*:

a. creating and having a practice, custom or policy of failing to review adequately whether children in its care were receiving proper medical care from their caregivers;

b. creating and having a practice, custom or policy of failing to keep adequate records, and failing to enforce any record-keeping rules it did have;

c. creating and maintaining a practice, custom or policy of inadequate investigations;

d. creating and maintaining a practice, custom or policy of overworking staff, even offering monetary bonuses to workers to take on more than 13 cases each;

e. creating and maintaining a practice, custom or policy of failing to supervise employees providing oversight to at-risk children that DHS was monitoring;

f. creating and maintaining a practice, custom or policy of accepting family noncompliance without enforcement, escalation, or reporting to DHS or courts;

g. creating and maintaining a practice, custom or policy of failing to train employees on enforcing service plan compliance and recognizing when services must be extended;

h. creating and maintaining a practice, custom or policy of failing to discipline employees who closed cases without achieving goals;

i. creating and maintaining a practice, custom or policy of failing to train employees on recognizing life-threatening medical neglect such as a child with severe asthma lacking rescue medication;

j. creating and maintaining a practice, custom or policy of failing to properly

manage medical plans under their control, including failing to reschedule doctor appointments.

149. As detailed above and as further demonstrated by the following examples, Defendant City of Philadelphia, through DHS, was aware of complaints that its workers and the workers of contracted CUAs failed to properly address and handle the medical neglect of children under its supervision and/or control before Nayshaun's death.

150. DHS workers' failure to follow proscribed procedures led to the starvation and death of Danieal Kelly in 2006.

151. Gerald Bush complained that in 2011, his granddaughter sustained a skull injury after DHS removed her from his home and placed her in a shelter.

152. In 2020, 3-year-old T.E. was found with fresh bruises, malnourishment, bradycardia from extreme dieting, and marks suggesting he had been tied—all while under the supervision of a CUA.

153. In 2022, 3-year-old Hope Jones died from multiple blunt-force trauma while in the care of a different CUA.

154. In both cases, DHS failed to properly supervise the CUA workers involved.

155. Sometime before October, 2021, Nashae Naeisha Smith complained that CUA workers under DHS' supervision provided inadequate medical and dental care for her three children.

156. The practices, customs or policies created, adopted and maintained by Defendants GPCA and the City were the proximate causes of the constitutional injuries suffered by Nayshaun, including his death.

157. For example, the practice, custom or policy of failing to properly manage medical

plans for individuals led to DHS failing to reschedule a missed doctor's appointment that would have allowed Nayshaun to receive the rescue inhaler that he needed when he had his fatal asthma attack on October 28, 2023.

**COUNT III: NEGLIGENCE**
**(Against GPCA and Individual GPCA Defendants: Harris, Cook and John/Jane Does 11-20)**

158. Plaintiff realleges and incorporates by reference all other allegations of this Complaint as if fully set forth herein.

159. Defendants owed Nayshaun a duty of reasonable care to provide for his safekeeping, care, and protection while they undertook the duty to provide services and monitor Nayshaun.

160. Defendants breached that duty by failing to protect Nayshaun from medical neglect, closing his case without ensuring his safety, accepting Patricia Clayton's refusal to cooperate with services, failing to ensure that Nayshaun received his much-needed rescue inhalers and failing to report non-compliance to DHS or the court.

161. Defendants knew or should have known that Nayshaun was in an unsafe environment, and by failing to protect him, caused his death.

162. As a direct and proximate result of the aforementioned conduct, Nayshaun suffered severe emotional and physical trauma and death.

**COUNT IV: WRONGFUL DEATH**
**(Against Individual DHS Defendants: Harrison, John, Jones, Lyas and John/Jane Does 1-10; Individual GPCA Defendants: Harris, Cook and John/Jane Does 11-20; and GPCA)**

163. Plaintiff incorporates all preceding allegations.

164. The Pennsylvania Wrongful Death Act, 42 Pa.C.S. § 8301, provides recovery for pecuniary loss suffered by beneficiaries due to wrongful acts causing death.

165. GPCA's and GPCA Defendants' negligence and/or deliberate indifference to Nayshaun's medical needs directly caused his death on October 28, 2023.

166. DHS Defendants' willful misconduct, including failing to reschedule Nayshaun's doctor's appointment so that he could receive his much-needed rescue inhalers, directly caused his death on October 28, 2023.

167. Nayshaun's survivors, including siblings Tynan Williams-Hughes and Timmiyah Garland, suffered pecuniary losses including loss of companionship, society, and comfort.

**COUNT V: SURVIVAL ACTION**
**(Against Individual DHS Defendants: Harrison, John, Jones, Lyas and John/Jane Does 1-10; Individual GPCA Defendants: Harris, Cook and John/Jane Does 11-20; and GPCA)**

168. Plaintiff incorporates all preceding allegations.

169. The Pennsylvania Survival Act, 42 Pa.C.S. § 8302, preserves causes of action Nayshaun could have brought had he survived.

170. Before death, Nayshaun experienced conscious pain and suffering during his fatal asthma attack, struggling to breathe while lacking his rescue inhaler.

171. Nayshaun suffered fear, anxiety, and distress from repeated episodes of being unable to breathe at school without medication.

172. Defendants' acts, including negligence, deliberate indifference and willful misconduct as outlined above, caused Nayshaun's pre-death pain, suffering, and loss of life's pleasures.

173. Defendants specifically caused ongoing harm in 2023 by failing to adequately monitor Nayshaun's wellness and medical needs despite taking on his medical management and despite being assigned as his case manager and supervisor.

**WHEREFORE**, Plaintiff seeks damages jointly and severally against all Defendants as follows:

1. Monetary damages, including compensatory damages for pre-death pain and suffering, loss of life, wrongful death, and survival damages;

2. Punitive damages;

3. Attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

4. Such other relief as the Court deems proper.

**JURY TRIAL DEMANDED**

Respectfully Submitted,

**MINCEY FITZPATRICK ROSS, LLC**

BY: /s/ *Riley H. Ross III*
Riley H. Ross III, Esquire/ PA Bar No. 204676
Zainab K. Shields, Esquire/ PA Bar No. 321181
One Liberty Place
1650 Market Street, 36th Floor
Philadelphia, PA 19103
Attorneys for Plaintiff

Date: January 2, 2026

## CERTIFICATE OF SERVICE

I, **Riley H. Ross III**, certify that on this date I caused a true and correct copy of the above Amended Complaint to be filed via the Court's electronic filing system and that the document is available for viewing and downloading.

Date: January 2, 2026

/s/ Riley H. Ross III
Riley H. Ross III