IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ESTATE OF N.W., *by and through its Administrator*, AISHA CLAYTON | : | CIVIL ACTION |
| | : | No. 25-6121 |
| v. | : | |
| CITY OF PHILADELPHIA, et al. | : | |

**MEMORANDUM**

**Judge Juan R. Sánchez** **August 18, 2026**

This civil rights action arises from the tragic death of eleven-year-old N.W. after a severe asthma attack. Aisha Clayton, as Administrator of N.W.'s Estate, brings this action against the City of Philadelphia and employees of its Department of Human Services (DHS), among others, alleging they knew N.W. lacked a rescue inhaler, undertook to arrange medical care for him, and then failed to follow through after he missed two medical appointments. The City and DHS employees Felicia R. Harrison, Ashley Minus (née John), Dwayne C. Jones, and Alonzo Lyas (collectively, the "City Defendants") move to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). Because the City Defendants did not affirmatively use state authority to create or increase the danger to N.W., and because the City Defendants are immune with respect to the related state law claims, the Court will grant the motion.[1]

**BACKGROUND[2]**

N.W. was an eleven-year-old child with severe asthma who lived with his grandmother and legal guardian, Patricia Clayton. Am. Compl. ¶¶ 45–46, Dkt. No. 27. He required regular asthma

[1] Plaintiff also brings claims against Greater Philadelphia Community Alliance (GPCA) and its employees, but those claims are not before the Court and remain pending.

[2] The following facts are taken from the Amended Complaint and accepted as true at this stage.

management and access to rescue medication. *Id.* Plaintiff alleges N.W. was repeatedly sent to school without a rescue inhaler and that Clayton had a history of failing to follow through with services arranged for him. *Id.* ¶¶ 47, 58, 63–64.

DHS first investigated N.W.'s household in 2019 after receiving reports involving sexual abuse concerns and the presence of a registered sex offender in the home. *Id.* ¶¶ 49–50. DHS substantiated concerns about N.W.'s sexualized behavior but closed the investigation after Defendant Lyas and other workers referred the family to a Community Umbrella Agency for in-home services. *Id.* ¶¶ 51–55. Those services ended several months later. *Id.* ¶ 62. Plaintiff alleges the service provider documented Clayton's refusal to transport N.W. to therapy and her refusal to sign paperwork needed to coordinate behavioral health services. *Id.* ¶¶ 58–61.

In May 2023, DHS received another referral alleging Clayton was failing to provide "adequate nurturing" and "basic needs" and could not control N.W. *Id.* ¶ 72. Defendant Harrison investigated the report under the supervision of Defendant Minus. *Id.* ¶ 75. They closed the investigation as "Invalid" in July 2023 after finding insufficient evidence to substantiate the allegations. *Id.*

DHS was first alerted to N.W.'s medical issues in September 2023. On September 6, 2023, N.W. experienced respiratory distress at school. *Id.* ¶ 80. When the school nurse could not reach Clayton, she called 911, and N.W. was transported by ambulance to a hospital. *Id.* ¶ 81. The nurse then reported to DHS that N.W. was repeatedly arriving at school without his rescue inhaler, the situation was life-threatening given his severe asthma, and she believed he was being medically neglected. *Id.* ¶ 82. Plaintiff alleges the nurse expressly warned DHS that N.W.'s life was at risk without a rescue inhaler. *Id.* ¶ 83.

Defendant Jones handled the resulting medical neglect investigation. *Id.* ¶ 84. During that investigation, a DHS nurse concluded N.W. needed "new med management" and, according to the Amended Complaint, told Clayton that DHS would take on responsibility for managing N.W.'s medical care. *Id.* ¶ 93. DHS scheduled appointments for N.W. at the Children's Hospital of Philadelphia for October 13, 2023, and Juniata Family Practice for October 16, 2023. *Id.* ¶ 96. DHS also arranged for transportation to the October 13 appointment. *Id.* ¶ 97. When the transportation arrived, Clayton refused to put N.W. in the vehicle. *Id.* She later asked DHS to reschedule that appointment, but DHS did not do so. *Id.* ¶ 100. N.W. also missed the October 16 appointment, which was not rescheduled. *Id.* ¶ 101.

Jones concluded that the medical neglect allegation was unfounded on October 5, 2023. *Id.* ¶ 85. DHS formally closed the investigation as "Unfounded" on October 19. *Id.* ¶ 104. Nine days later, on October 28, N.W. awoke unable to breathe. *Id.* ¶¶ 19, 105. Clayton attempted to treat him with a nebulizer, but his condition did not improve. *Id.* ¶¶ 20–21. Emergency responders transported him to a hospital, where he was pronounced dead from a severe asthma attack. *Id.* ¶¶ 26–27. Plaintiff alleges N.W. did not have the rescue inhaler that the missed appointments were intended to secure. *Id.* ¶ 29.

The Amended Complaint includes five counts. Count I is a 42 U.S.C. § 1983 state-created danger claim against the City, the individual DHS Defendants, GPCA, and GPCA employees. Count II asserts municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against the City and GPCA. Count III alleges negligence claims against GPCA and its employees. Counts IV and V allege wrongful death and survival claims against the individual DHS Defendants, GPCA, and GPCA employees. The City Defendants seek dismissal of all claims asserted against them in Counts I, II, VI, and V. Defs.' Mot. 1, Dkt. No. 33.

**STANDARD OF REVIEW**

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted). A claim is facially plausible when the facts pleaded permit a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A court reviewing a Rule 12(b)(6) motion separates factual allegations from legal conclusions, accepts well-pleaded facts as true, draws reasonable inferences in the plaintiff's favor, and then determines whether those facts plausibly establish an entitlement to relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009); *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021). The Court may consider the complaint, exhibits attached to it, matters of public record, and documents integral to or explicitly relied on in the complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).[3]

**DISCUSSION**

Section 1983 provides a remedy for the deprivation of a federal right by a person acting under color of state law. 42 U.S.C. § 1983. Plaintiff invokes the substantive component of the Fourteenth Amendment's Due Process Clause to assert a state-created danger claim against the City Defendants under § 1983. The Due Process Clause does not require the State to protect people from private harm. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–97 (1989).

[3] The City Defendants cite medical websites in their motion to argue a nebulizer could have adequately treated N.W.'s asthma. Defs.' Mot. 7 n.2. The Court does not rely on those materials.

The Third Circuit, however, recognizes a narrow state-created danger exception to this general rule. To state a claim for a substantive due process violation under the state-created danger theory, a plaintiff must plausibly allege that: (1) the harm suffered was "foreseeable and fairly direct"; (2) the state actor "acted with a degree of culpability that shocks the conscience"; (3) the plaintiff "was a foreseeable victim . . . or a member of a discrete class" of foreseeable victims; and (4) the state actor "affirmatively used . . . authority" in a way that created a danger or rendered the plaintiff "more vulnerable to danger than" if the State had not acted. *Mears v. Connolly*, 24 F.4th 880, 883–84 (3d Cir. 2022) (quoting *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006)). Because all four elements are required, the Court need only address the fourth element, which is dispositive here.

The fourth element distinguishes a constitutional deprivation from a mere failure to protect. In *Bright*, police told a family they would arrest a probation violator but did not do so before he murdered their daughter. 443 F.3d at 279. The Third Circuit held that "expressing an intention" to act, followed by a failure to act, was not an affirmative use of authority that created the danger. *Id.* at 284. In *Ye v. United States*, a publicly employed doctor assured a seriously ill patient that he had nothing to worry about and was fine. 484 F.3d 634, 635 (3d Cir. 2007). The Third Circuit held the assurance could not "form the basis of a state-created danger claim" because it did not restrain the patient's freedom to seek other care. *Id.* at 640–41.

*Mears* applied the same rule to a state psychiatrist who encouraged a mother to visit her involuntarily committed adult son and assured her it was safe to do so. 24 F.4th at 882–83. The Third Circuit held the assurance was not an affirmative act for state-created danger purposes because the psychiatrist did not take away the mother's ability to "choose whether to visit." *Id.* at 884. In contrast, a nurse who initially supervised the visit and then left the mother alone with the

patient could be liable under the state-created danger theory because the nurse's "departure deprived [the mother] of the freedom to avoid an unsupervised visit or to take other precautions." *Id.* at 885. As the foregoing cases illustrate, the Third Circuit has distinguished between an assurance or omission that leaves a person free to act, which does not constitute the affirmative use of state authority required for a state-created danger claim, and an exercise of state authority that changes the person's position for the worse, which does.

The Third Circuit also evaluates the fourth element by asking whether the State's exercise of authority causes "a departure from th[e] status quo." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 243 (3d Cir. 2016). In *L.R.*, a school employee released a kindergarten student from a classroom to an unidentified adult. *Id.* at 239–40. The court held the affirmative release changed the status quo and exposed the child "to a danger she would not have otherwise encountered." *Id.* at 243–44. The court distinguished the situation from that presented in *DeShaney*, in which child welfare officials knew a child faced serious abuse, had temporarily taken custody of him, and later returned him to his abusive father. Unlike in *L.R.*, *DeShaney* involved a return to the preexisting situation—i.e., "maintenance of the status quo." *Id.* at 243 (discussing *DeShaney*).

The Third Circuit has drawn a similar distinction in child welfare cases. In *Bennett ex rel. Irvine v. City of Philadelphia*, 499 F.3d 281 (3d Cir. 2007), DHS received reports that children were endangered in their mother's home, a social worker failed to take the required steps, and DHS later closed a dependency case. *Id.* at 282–86. The Third Circuit held those failures did not create the danger to the children, which preexisted any action by DHS, and closing the dependency case did not prevent others from acting. *Id.* at 289.

Plaintiff's allegations are similar to those the Third Circuit has found insufficient to establish affirmative constitutional violations under the state-created danger doctrine. Before DHS

intervened in September 2023, N.W. lived in Clayton's custody, had severe asthma, and was repeatedly without his rescue inhaler. The danger alleged in the Amended Complaint was Clayton's failure to ensure N.W. had medication and attended medical appointments. DHS did not create that danger.

Nor did DHS affirmatively make that danger worse. The most concrete affirmative conduct alleged is that a DHS nurse told Clayton DHS would arrange medical care for N.W. DHS then scheduled two appointments and arranged transportation to one of them. Those actions increased N.W.'s access to medical care. Clayton remained free to seek care on her own, schedule or reschedule an appointment, obtain medication through another provider, or take N.W. for emergency treatment. Indeed, the Amended Complaint alleges Clayton herself contacted DHS to ask that the first missed appointment be rescheduled. Nothing in the pleading suggests DHS told her she could not obtain care independently, canceled an appointment she had arranged, withheld medication already available to N.W., took custody of N.W., or otherwise used state authority to prevent private action.

Plaintiff emphasizes that Clayton allegedly relied on DHS after the nurse said DHS would take on responsibility for arranging care. *See* Am. Compl. ¶ 138. But the Third Circuit has consistently rejected the proposition that reliance on a government assurance, without a corresponding restraint on the person's freedom to act, is enough. *See Ye*, 484 F.3d at 640–41; *Mears*, 24 F.4th at 885–86. The allegation that Clayton "could have" rescheduled the appointments herself but relied on DHS does not plausibly establish that DHS used its authority to prevent her from doing so. *See* Am. Compl. ¶ 126.

The remaining acts identified by Plaintiff are omissions: DHS did not reschedule missed appointments, did not remove N.W. from the home, did not provide the inhaler directly, did not

adequately investigate, and closed the medical neglect investigation. *See id.* ¶¶ 133–39. Recasting those failures to act as affirmative "abandonment" does not change their character. *See* Pl.'s Opp'n 6–8, Dkt. No. 34. The relevant danger existed before DHS became involved, and when DHS stopped acting, N.W. remained where he had been—in Clayton's custody and without a rescue inhaler.

Because the Amended Complaint does not plausibly allege the fourth element of a state-created danger claim, Count I fails against Harrison, Minus, Jones, and Lyas. Count I also names the City. To the extent Plaintiff seeks to hold the City directly liable for its employees' conduct, § 1983 does not permit municipal liability on a respondeat superior theory. *Monell*, 436 U.S. at 691.

Count II seeks to hold the City liable under *Monell* for alleged customs and policies involving inadequate investigations, premature case closure, excessive caseloads, inadequate training and supervision, and poor management of medical service plans. Am. Compl. ¶ 148. A municipality may be liable under § 1983 when an official policy or custom causes a constitutional injury. *Monell*, 436 U.S. at 694. But municipal liability still requires an underlying constitutional deprivation. *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

As explained above, the conduct of the City employees alleged in the Amended Complaint did not violate N.W.'s substantive due process rights under the state-created danger doctrine. Count II therefore fails against the City. The Court does not decide the sufficiency of the separate municipal liability allegations against the GPCA, which did not file a motion to dismiss.

Counts IV and V assert claims under Pennsylvania's Wrongful Death and Survival Acts against Harrison, Minus, Jones, and Lyas, among others. The individual DHS Defendants argue they are immune under the Pennsylvania Political Subdivision Tort Claims Act (PSTCA).

The PSTCA generally gives an employee of a local agency immunity for conduct within the scope of employment to the same extent as the employing agency is immune. 42 Pa. Cons. Stat. § 8545. Section 8550 removes that protection when the employee's act constitutes, among other things, "willful misconduct." 42 Pa. Cons. Stat. § 8550. In this context, willful misconduct requires specific intent: the employee must desire the resulting harm or know that the harm is "substantially certain to follow." *Bright*, 443 F.3d at 287 (citation and quotation marks omitted). Reckless and deliberate indifference, even if proven, do not satisfy that standard. *Id.*

The Court agrees the challenged conduct by the individual DHS Defendants falls within the scope of their immunity under the PSTCA. First, the challenged conduct falls within the scope of the individual DHS Defendants' employment, so they are generally immune under § 8545. Second, the Amended Complaint does not plausibly allege any individual DHS Defendant wanted N.W. to suffer a fatal asthma attack or knew such a death was substantially certain to follow from his or her conduct, so the willful misconduct exception does not apply. Lyas's involvement concerned only the 2019 sexual abuse investigation. Harrison and Minus investigated the May 2023 report concerning nurturing, basic needs, and behavioral problems. Their alleged decisions to close those investigations may support Plaintiff's broader criticism of DHS, but the facts pleaded do not support a reasonable inference of specific intent to cause asthma-related death.

Jones's involvement was closer in time and subject matter to N.W.'s tragic death, but the same defect remains. Plaintiff alleges Jones handled the September 2023 medical neglect investigation and determined the allegation of neglect was unfounded. The school nurse's warning that N.W.'s life was at risk without a rescue inhaler plausibly alleges awareness of a serious danger. It does not, however, plausibly allege awareness that death was substantially certain to follow. The additional allegations that DHS arranged two medical appointments for N.W. and arranged

transportation for one of them belie an inference of the specific intent necessary for willful misconduct. At most, the allegations charge Jones and other DHS personnel with ignoring or inadequately responding to a known serious risk. But deliberate disregard of a known risk is not the specific intent required for willful misconduct under § 8550. *Bright*, 443 F.3d at 287.

Accordingly, the individual DHS Defendants remain immune from the state law claims pleaded in Counts IV and V. Because the City itself is not named in those counts, the Court need not address the separate statutory exceptions governing local agency liability under 42 Pa. Cons. Stat. §§ 8541–42. This ruling does not affect the claims against GPCA and its employees.

The City Defendants request dismissal with prejudice. Leave to amend "should be liberally given unless amendment would be inequitable or futile." *Montanez v. Price*, 154 F.4th 127, 151 (3d Cir. 2025). Plaintiff has already amended the complaint once, and the parties fully briefed the sufficiency of the amended pleading. Third Circuit precedent forecloses a state-created danger claim based on the facts pleaded because the City Defendants' alleged assurance and omissions did not restrain Clayton's ability to obtain care or otherwise change N.W.'s position for the worse. Additional details about the same course of conduct would not cure that legal defect. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) ("Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted." (citation modified)). Because the defects in the state-created danger claim against the individual City Defendants cannot be cured, the related *Monell* claim against the City also cannot be cured on the pleaded theory. The state law claims also face the same futility problem. The pleaded conduct, even taken as deliberate indifference to a serious risk, does not amount to the specific intent Pennsylvania law requires for willful misconduct. The claims against the City Defendants will therefore be dismissed with prejudice.

**CONCLUSION**

For the foregoing reasons, the City Defendants' motion to dismiss will be granted. The Court will dismiss Count I with prejudice as to the City, Harrison, Minus, Jones, and Lyas. Count II will be dismissed with prejudice as to the City. And Counts IV and V will be dismissed with prejudice as to Harrison, Minus, Jones, and Lyas. Count III and all claims against GPCA, Harris, Cook, and the remaining Doe Defendants are unaffected.

An appropriate Order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.